IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA      :
                                               :

          v.                       :  CRIMINAL ACTION NO.
                                             :  1:11-CR-0337-WBH-CCH
KEITH WADE                   :

## **<u>ORDER FOR SERVICE OF REPORT AND RECOMMENDATION</u>**

Attached is the Report and Recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Criminal Local Rules 12.1(E) and 58.1(A)(3).

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to file an objection to the Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to 18 U.S.C. 3161(h)(1)(D), the above referenced fourteen (14) days allowed for filing objections are **EXCLUDED** from the computation of time under the Speedy Trial Act. At the end of such fourteen-day period, the Clerk is **DIRECTED** to submit this Report and Recommendation to the District Judge.

After the submission of this Report and Recommendation to the District Judge, whether or not any objection has been filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time under the Speedy Trial Act the time, up to thirty (30) days, that this Report and Recommendation is under advisement before the District Court. *Henderson v. United States*, 476 U.S. 321, 331 (1986) (the Speedy Trial Act "exclude[s] all time that is consumed in placing the trial court in a position to dispose of a motion"); *United States v. Mers*, 701 F. 2d 1321, 1337 (11th Cir. 1983) ("[T]he magistrate and the district court have thirty days each during which to take pretrial motions under advisement.").

IT IS SO ORDERED this 4th day of January, 2012.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA     :
                                    :
        v.                :  CRIMINAL ACTION NO.
                                    :  1:11-CR-0337-WBH-CCH
KEITH WADE                   :

## REPORT AND RECOMMENDATION

Defendant Keith Wade ("Defendant") is charged in the indictment with being a felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(2). *See* Indictment [1]. This action is before the Court on Defendant's Motion to Suppress Evidence [20] (the "Motion"), in which Defendant argues that a warrantless search of his residence violated the Fourth Amendment because the search was not supported by a reasonable suspicion that criminal conduct was occurring and exceeded the scope of the search waiver provision agreed to by Defendant as a condition to his parole.

On October 13, 2011, the Court held an evidentiary hearing and took the Motion under advisement. *See* Minute Entry [24] of October 13, 2011. A Transcript [29] of that hearing was filed November 17, 2011. Thereafter, Defendant filed a post-hearing brief in support of his Motion [30] on November 28, 2011, the Government

filed a response brief [31] to the Defendant's Motion on December 12, 2011, and Defendant filed a reply brief [32] on December 19, 2011, at which time the Motion became ripe for a decision by the Court. Having heard the evidence and having reviewed the transcript of the evidentiary hearings and the briefs of the parties, for the reasons set forth below, the undersigned **RECOMMENDS** that Defendant's Motion To Suppress Evidence [20] be **DENIED**.

## FINDINGS OF FACT

1.      Defendant is a previously convicted felon who was released on parole on or about July 21, 2010. *See* Government's Exhibits ("Gov. Ex.") 4 and 5, Hearing of October 13, 2011 (showing that Defendant signed the conditions of his parole prior to his release on that day).

2.      Upon his release, Defendant signed a document agreeing to several standard conditions under which his parole was granted. The standard conditions included that Defendant would "comply with a rehabilitation plan" requiring him to obtain work, submit to drug tests, and "truthfully answer all questions and follow all written and verbal instructions from [his] Parole Officer"; that Defendant would not violate any laws, would immediately notify his Parole

Office if he was arrested for any offense, and would submit to "a warrantless search of my person, papers, and place of residence, automobile, or any other property under my control" by a parole officer at any time; that Defendant would not "receive, possess, or transport, have under [his] control, attempt to purchase, or obtain transfer of any firearm, ammunition, explosives or other deadly weapons"; that Defendant would not leave the state, even briefly, or change his place of residence; that Defendant would make child support, restitution, and parole supervision fee payments as well as pay a reasonable fee for electronic monitoring; and that Defendant would pursue a general education diploma if he did not already possess a high school education or its equivalent. Gov. Ex. 4; Transcript of October 13, 2011 Hearing ("Tr.") [29] at 22.

3.     Upon his release, Defendant also signed a document agreeing to several special conditions of his parole. The special conditions expanded on several of the standard conditions of Defendants parole, and in addition, included that Defendant would comply with a 6:00 am to midnight curfew; that Defendant would not associate with persons on parole or probation, convicted felons, or anyone who is of bad reputation; that Defendant would only reside at the address to which he was paroled and that Defendant would not live at one

residence but stay at another; that Defendant would not act as an informant for any law enforcement agency without written approval from the Parole Board; that Defendant would obtain legitimate employment and monthly submit his pay stubs to his parole officer; and that Defendant would not "own, possess, use, sell, or have under [his] control any firearm, prohibited weapon, or illegal weapon; nor shall [he] unlawfully carry any weapon or use, attempt to threaten to use any tool, implement, or object to cause bodily injury." Gov. Ex. 5.

4.  In October 2010, Parole Officer Krystle Hunter ("Officer Hunter") began supervising Defendant after his parole was transferred to her office's jurisdiction. Tr. at 17–18.

5.  Officer Hunter met with Defendant upon her assignment as his supervising officer, and at that time she reviewed with him the standard and special parole conditions to which he had previously agreed. Officer Hunter believes that Defendant understood those conditions. Tr. at 22, 24.

6.  Under the terms of Defendant's Parole Plan Verification, Defendant's residence was identified as 3705 Pebble Beach Drive, College Park, Georgia, 30349. Gov. Ex. 14.

7.  Defendant lived with his mother, Mrs. Roundtree,[1] and her husband, Mr. Roundtree, at that address. Defendant had access to his bedroom, a common bathroom, and a common living room, all on the lower level of the house. Gov. Ex. 14; Tr. at 118–19.

8.  On or about December 27, 2010, Officer Hunter received a phone call from a person who chose not to identify himself stating that Defendant had made threatening phone calls, had sent threatening text messages, and had driven past the caller's house several times. Tr. at 14–15.

9.  The caller stated that he "was scared for his life" and that Defendant had been making threats to him and his current fiancée, whom he believed was an ex-girlfriend of Defendant's or a person Defendant "had cared about in the past." Tr. at 15.

10. The threats that the caller claimed Defendant made included a text message with two pictures attached. The first picture showed a man Officer Hunter recognized as Defendant holding an assault rifle, and the second picture showed

---

[1] Defendant's mother's surname is spelled by Defendant as "Rountree" and by the Government and the court stenographer as "Roundtree." The Court will refer to Defendant's mother as "Mrs. Roundtree."

an assault rifle and a pistol lying on a counter top. The text message accompanying the pictures read: "this how i think !!!!" Tr. at 15; Gov. Exs. 1–3.

11. Immediately after receiving the call, Officer Hunter requested and received permission to conduct a warrantless search of Defendant's residence. Tr. at 30–33.

12. Officer Hunter did so because parole officers were required to seek permission to conduct a warrantless search when they had reasonable suspicion that a search would reveal evidence of a parole violation. Officer Hunter suspected that Defendant was engaging in criminal activity because the pictures she received from the caller showed Defendant "in possession of what appear[ed] to be an assault rifle, a firearm that is in direct violation of his parole." Based on the information conveyed by the caller and the activity depicted in the pictures she received, Officer Hunter believed her suspicion of criminal activity was reasonable. Tr. at 17, 31–32.

13. Two days after receiving the anonymous call, on December 29, 2010, Officer Hunter, along with several other officers, arrived at Defendant's residence. Tr. at 52–53.

14. The officers approached the house, identified themselves to Defendant's mother, Mrs. Roundtree, and gained entry to search the residence. Tr. at 86–87.

15. Mrs. Roundtree told the officers that Defendant lived downstairs and did not use the upstairs. Mrs. Roundtree asked that the officers not search upstairs or in the garage. Tr. at 44–49.

16. The officers proceeded to search the downstairs living room, bedroom, and bathroom. The officers did not search the areas Mrs. Roundtree asked they not search. Tr. at 44–49.

17. During the search, Parole Officer Andrew Reiken ("Officer Reiken") found "two loaded AK-47 magazines with live ammunition" on top of an entertainment center in the downstairs living room, approximately two and one-half feet from the entrance to Defendant's bedroom. Tr. at 60–61. Officer Reiken also found a box of 9 mm ammunition in the closet of Defendant's bedroom in between some shoes. Tr. at 65–67.

18.	The State of Georgia Board of Pardons and Paroles ("GPP") Field Operations Manual ("GPP Manual") directs that parole officers should conduct warrantless searches of a parolee's "person, papers, place of residence, automobile or any other property . . . only after 'reasonable suspicion' have [sic] been established." Gov. Ex. 13.

19.	The GPP Manual also provides that "[s]earches of parolees' residences should be limited to areas under their control. For example, a search of 'common areas' in the parent's home of a parolee residing with his parents may not be justified unless there is 'reasonable suspicion' that the parolee has concealed contraband in that location." Gov. Ex. 13.

## DISCUSSION

Defendant has moved to suppress all of the evidence obtained during the search of his residence. Defendant contends that a warrantless search of a parolee requires reasonable suspicion, and that the facts known by the parole officers prior to conducting the warrantless search did not support a reasonable suspicion that Defendant was engaging in criminal activity. Defendant also argues that the evidence relied upon by Officer Hunter to form the basis of her reasonable suspicion was stale.

Defendant further contends that, even if the parole officers did have reasonable suspicion to conduct the search, the evidence obtained from the common area living room should be suppressed because that part of the house was beyond the scope allowed for warrantless searches under the search waiver provision of his parole agreement and the operating procedures in the GPP Manual.

In response, the Government argues that Defendant did not have an expectation of privacy so that even a suspicionless search would not offend his Fourth Amendment rights. The Government also maintains that, even if reasonable suspicion is required before conducting a warrantless search of a parolee's residence, the parole officers in this case possessed reasonable suspicion that Defendant was engaging in criminal activity and the evidence relied upon in forming that reasonable suspicion was not stale. Finally, the Government asserts that the scope of the search was appropriate under the terms of Defendant's parole and the guidance of the GPP Manual.

## 1. The Search of Defendant's Residence was Lawful

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy. U.S. Const. amend. IV; *United States v. Place*, 462 U.S. 696, 706-07 (1983). "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118–19 (2001). In *Knights*, the Supreme Court upheld a search of the home of a probationer where there was reasonable suspicion of criminal conduct and the search was an agreed-upon condition of probation. *Id.* at 121–22. Since a reasonable suspicion was present in *Knights*, the Supreme Court noted, but did not decide, the issue of whether the condition of probation, by itself, was sufficient to constitute a consent search or to satisfy the reasonableness standard of the Fourth Amendment. *Id.* at 120 n.6.

Subsequent to *Knights* the Supreme Court upheld a search of a parolee without any requirement of suspicion where state law provided that all parolees had to agree in writing to a search at any time and with or without cause. *Samson v. California*,

547 U.S. 843 (2006). In so holding, the Supreme Court emphasized that parole was "more akin to imprisonment than probation is to imprisonment" because parole constitutes release from prison before completion of a sentence, and therefore, concluded that "parolees enjoy even less of the average citizen's absolute liberty than do probationers." *Samson* at 850. Applying *Samson*, the Eleventh Circuit held in *United States v. Stewart*, 213 F. App'x 898, 899 (11th Cir. 2007), that, given the State of Georgia's substantial interest in supervising parolees in order to reduce recidivism and promote reintegration, and given the significantly diminished expectation of privacy of a parolee released subject to a condition permitting suspicionless searches, no level of suspicion is required under the Fourth Amendment to conduct a search of a parolee's person or residence.

The facts of this case similarly suggest that Defendant had a limited expectation of privacy. Defendant was a parolee, and in order to be released on parole, Defendant agreed to several conditions which restricted his liberty and limited his expectation of privacy: (1) Defendant agreed to random drug tests; (2) Defendant agreed to truthfully answer all questions and follow all written and verbal instructions from his Parole Officer; (3) Defendant agreed not to leave his state of residence or change his place of residence without first getting permission from his Parole Officer; (4) Defendant

agreed to check in with his Parole Officer monthly; (5) Defendant agreed to comply with a 6:00 am to midnight curfew; (6) Defendant agreed not to associate with certain persons of disrepute or go to bars, pool halls, or high drug area; and (7) Defendant agreed to obtain legitimate employment and submit pay-stubs every month to his Parole Officer. FOF ¶¶ 2, 3. Most significantly, Defendant agreed to submit, at any time, to a warrantless search by any Parole Officer of "[his] person, papers, and place of residence, automobile, or any other property under [his] control." FOF ¶ 2. As the Supreme Court explained in *Samson*, "the essence of parole is release from prison, before completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Samson*, 547 U.S. at 850. These restrictions on liberty imposed through the standard and special conditions of Defendant's parole significantly reduced Defendant's expectation of privacy.

In addition, the State of Georgia has a strong and legitimate concern that a parolee will be more likely than an ordinary member of the community to engage in criminal conduct. *See, e.g., Knights*, 534 U.S. at 121. As the Eleventh Circuit found in *Stewart*, the State of Georgia's substantial interest in supervising parolees to reduce recidivism and promote reintegration, combined with a parolee's diminished expectation of privacy, renders even a suspicionless search of a parolee's person or

12

residence reasonable under the Fourth Amendment. *Stewart*, 213 F. App'x at 899.

Thus, balancing the interests in this case suggests that reasonable suspicion was not required for Officer Hunter and the other parole officers to conduct a search of Defendant's residence, and the evidence obtained from that search should not be suppressed on that ground.

A.    *The Officers Had Reasonable Suspicion*

Morever, even if, as Defendant argues, the search of his residence required reasonable suspicion, the Court finds that Officer Hunter reasonably suspected that Defendant was engaging in criminal conduct.[2]  In order to establish a reasonable suspicion, an officer must be able to show "specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant [an] intrusion."

_____

[2] Defendant's argument that reasonable suspicion was required relies, in part, on the fact that the GPP Manual provides that parole officers should conduct warrantless searches of parolees only after reasonable suspicion has been established. FOF ¶ 18.  This Court, however, finds that though a suspicionless search would have been improper under that provision of the GPP Manual, it would not have violated the Fourth Amendment's protection against unreasonable searches, pursuant to *Samson* and *Stewart*.  In the absence of any persuasive argument to the contrary offered by Plaintiff, this Court believes that a violation of the State of Georgia's operating procedures for searching a parolee may give rise to disciplinary action against the offending officers, but unlike a violation of a Constitutional right guaranteed under the Fourth Amendment, however, the fruits of the offending search need not necessarily be suppressed.

*Terry v. Ohio*, 392 U.S. 1, 21 (1968). What is a "reasonable suspicion" is determined

from the totality of the circumstances, *United States v. Sokolow*, 490 U.S. 1 (1989),

which must be "particularized as to the person and as to the place that is to be

searched." *United States v. Henao-Castano*, 729 F.2d 1364, 1366 (11th Cir. 1984).

In *Griffin*, the Supreme Court expanded on the meaning of "reasonable suspicion" in

the context of court supervision:

> In such circumstances it is both unrealistic and destructive of the whole
> object of the continuing probation relationship to insist upon the same
> degree of demonstrable reliability of particular items of supporting data,
> and upon the same degree of certainty of violation, as is required in other
> contexts. In some cases—especially those involving drugs or illegal
> weapons—the probation agency must be able to act based upon a lesser
> degree of certainty than the Fourth Amendment would otherwise require
> in order to intervene before a probationer does damage to himself or
> society. The agency, moreover, must be able to proceed on the basis of
> its entire experience with the probationer, and to assess probabilities in
> the light of its knowledge of his life, character, and circumstances.

483 U.S. at 879.

In this case, it is undisputed that Officer Hunter received an anonymous tip

stating that the caller was scared for his life and which included pictures of Defendant

possessing a weapon as well as a text message suggesting that Defendant was issuing

threats in connection with his possession of that weapon. FOF ¶¶ 8–10. That conduct,

if true, would violate the conditions of his parole, which prohibited him from "own[ing], possess[ing], us[ing], sell[ing], or hav[ing] under [his] control any firearm, prohibited weapon, or illegal weapon," and "unlawfully carry[ing] any weapon or us[ing], attempt[ing] or threaten[ing] to use any tool, implement or object to cause bodily injury." Gov. Exs. 4, 5; FOF ¶¶ 2, 3. While Defendant attempts to argue that the information relied upon by Officer Hunter was "stale" since it is not clear how long Officer Hunter waited after receiving the tip before acting, Officer Hunter's testimony indicates that she received the information on or about December 27, 2010, acted immediately by requesting permission to conduct the search in question, and proceeded to search Defendant's residence two days later on December 29, 2010. FOF ¶¶ 11, 13. The Court finds that there is no arguable basis for claiming that the evidence relied upon by Officer Hunter was stale.

Defendant also urges the Court to find that an unverified, anonymous tip was not a reasonable basis for conducting a search of Defendant's residence. Under the law of this Circuit, "[t]o have a reasonable suspicion based on an anonymous tip, the tip must be reliable in its assertion of illegality, not just in the tendency to identify a determinate person." *United State v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007). In *Lindsey*, the police received a 911 call from someone who gave only the name

"Davis" and claimed that he saw the defendants, who matched the descriptions of suspects in a string of armed robberies, putting guns in a car. Acting on this tip, police searched the vehicle and seized weapons. The Eleventh Circuit found that, since the tip was consistent with facts already discovered during an ongoing investigation, the officers had more than a mere "hunch" or an "inchoate and unparticularized suspicion." Id. at 1291. In contrast, in *Florida v. J.L.*, 529 U.S. 266, 268 (2000), the Supreme Court found that a bare-bones, anonymous tip that a person was carrying a gun was, "without more, [in]sufficient to justify a police officer's stop and frisk of that person."

Defendant's contention that the facts of this case are closer to the bare-bones tip in *J.L.* than the tip which was consistent with other known facts in *Lindsey* is unconvincing. The anonymous caller in this case did more than claim that Defendant was carrying a gun: the anonymous caller also produced photographs allegedly sent to him by Defendant showing Defendant holding a gun, and the caller provided a text message allegedly sent by to him by Defendant in conjunction with the photographs which could be perceived as menacing or threatening. FOF ¶¶ 8, 10. Further, the anonymous caller passed along information to Officer Hunter suggesting that Defendant was possessing weapons and flaunting his firearms for a particular purpose:

16

to harass or threaten the caller and his fiancée, whom the caller believed was an ex-girlfriend or close friend of Defendant. FOF ¶ 9. What is more, Officer Hunter instantly recognized the man in the pictures as Defendant. FOF ¶ 10. These details provided reliable, corroborating facts tending to show that a determinate person, Defendant, was engaging in the illegal act of possessing a weapon in violation of his parole. The tip, therefore, provide the police with more than a mere hunch or inchoate and unparticularized suspicion, and the totality of the circumstances suggests that Officer Hunter's reaction to the tip was reasonable and appropriate.[3] Thus, Defendant's claim that this anonymous tip provided no reasonable basis to conduct a search of his residence because it was "unverified and uncorroborated" and came from an "unknown tipster" is simply unavailing.

In sum, the Court finds that evidence obtained from the search of Defendant's residence should not be suppressed because reasonable suspicion is not required under

---

[3] Indeed, the Court queries what other response by Officer Hunter would have been more appropriate in this case. It seems to this Court that it would have been unreasonable for Officer Hunter to *not* suspect that Defendant, a felon on parole, was engaging in criminal activity after she received photographs of Defendant brandishing an assault rifle. Thus, even if Defendant could show that the photographs Officer Hunter received were fraudulent or altered—which Defendant has not attempted to do—ignoring the tip altogether because the pictures might be fakes would have been irresponsible, or worse, negligent.

the Fourth Amendment before officers conduct a search of a parolee's residence, and that even if reasonable suspicion was necessary, Officer Hunter's reasons for suspecting that Defendant was engaging in criminal activity were reasonable and justified.

**2.     The Scope of the Search Was Appropriate**

Defendant also argues that, even if the search of his residence was legal, the scope of the search conducted by the parole officers was inappropriate.  Defendant's claim is that, under the terms of his parole and the provisions of the GPP Manual, the parole officers were limited to searching only those areas of his residence under his exclusive control, in this case his bedroom.  Defendant thus contends that the ammunition recovered from an armoire in a shared living room adjacent to his bedroom should be admissible at trial.

The GPP Manual provides that "[s]earches of parolees' residences should be limited to areas under their control.  For example, a search of 'common areas' in the parent's home of a parolee residing with his parents may not be justified unless there is 'reasonable suspicion that the parolee has concealed contraband in that location." FOF ¶ 19.  The conditions of Defendant's parole further provide that his "Parole

Officer or any other Parole Officer may, at any time, conduct a warrantless search of [his] person, papers, and place of residence, automobile, or any other property under [his] control." FOF ¶ 2. Defendant argues that these two provisions should be read to restrict the scope of the search of his residence to only his bedroom.

As an initial matter, the Court notes that it finds no reason that evidence obtained from an area that may have been outside the scope of the search as defined by the State of Georgia's operating procedures must be suppressed, since that violation would not necessarily violate Defendant's Fourth Amendment rights. *See supra* note 2. In addition, the Court notes that the language of Defendant's parole conditions does not, on its face, restrict any search of his residence to only those areas under his exclusive control; rather, the qualifying clause, "under [his] control," modifies only the term relating to searches of "any other property" of Defendant and does not, under any valid reading of the document, modify the term permitting searches of Defendant's residence at any time. That is, the condition of parole agreed to by Defendant allowing for suspicionless searches of his residence at any time is unqualified.

Notwithstanding these provisions, the testimony of the officers as well as that of Mrs. Roundtree, the person who permitted the officers to search the residence,

indicates that the search of the living room adjacent to Defendant's bedroom was appropriate and consented to. Mrs. Roundtree agreed to let the parole officers search her residence where her son, Defendant, lived, and she informed the parole officers at that time that Defendant had full use of the downstairs living room, bathroom, and bedroom. FOF ¶ 14–15. Mrs. Roundtree did not ask that the officers not search any of the three downstairs rooms because they were also used by other members of the household, but instead, acquiesced to a search of those areas. FOF ¶¶ 15–16. Notably, Mrs. Roundtree did, however, ask that the officers not search several areas of the house which Defendant did not use, including the upstairs and the garage, and the officers complied with that request and limited their search to the areas Mrs. Roundtree informed them Defendant used. FOF ¶ 16. Accordingly, the person with whom Defendant shared use of the downstairs common areas permitted the parole officers to conduct the search. *See United States v. Matlock*, 415 U.S. 164, 171 (1973) (where "permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises," the search passed Fourth Amendment muster).

Finally, even if the GPP Manual should be read to mandate that the police have reasonable suspicion to search any common areas and the evidence militates that the

officers should have considered the living room a common area rather than an area of exclusive use by Defendant, the GPP Manual indicates that such areas may be searched when reasonable suspicion exists. As discussed above, the parole officers in this case had reasonable suspicion to search Defendant's residence, and the fact that Mrs. Roundtree informed the officers that Defendant used only the rooms on the lower level of the house provided the officers with reasonable suspicion that contraband or other evidence of criminal activity could be located in the room directly beside Defendant's bedroom. Indeed, the armoire on top of which parole officers found contraband was located less than three feet from the entrance to Defendant's bedroom. Thus, the Court finds that even if reasonable suspicion was required to search common areas outside Defendant's exclusive control within his residence, the parole officers in this case had the requisite level of suspicion.

Accordingly, the parole officers' search of Defendant's bedroom along with the adjacent common bathroom and common living room was not illegal, and the evidence obtained from that search should not be suppressed.

## RECOMMENDATION

For all the above reasons, the undersigned **RECOMMENDS** that Defendant's Motions to Suppress Evidence [20] be **DENIED**.

**IT IS SO RECOMMENDED** this 4th day of January, 2012.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE